UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        )        CR. NO. F. 05-00482 OWW
                                 )
                 Plaintiff,      )
                                 )
        v.                       )
                                 )        MEMORANDUM DECISION AND ORDER
                                 )        DENYING DEFENDANT'S MOTION FOR
                                 )        JUDGMENT OF ACQUITTAL AND NEW
RONALD VAUGHN Jr.,               )        TRIAL
                                 )
                                 )
                                 )
                                 )
                 Defendant.      )
_____)

DECISION

    This written decision supplements the oral statement of

decision made in open court following hearing of these motions.

A grand jury returned a three-count second superseding indictment

on January 10, 2008,[1] charging the defendant with two counts of

possession of child pornography and one count of receipt of child

_____

    [1] A grand jury returned a one-count indictment against the
defendant charging him with possession of child pornography on
November 22, 2005.  Dkt. # 6.  A grand jury returned a three-count
superseding indictment against the defendant on October 11, 2007,
charging him with two counts of possession of child pornography and
one count of receipt of child pornography.  Dkt. # 69.

pornography.  Dkt. # 138.  The defendant pleaded not guilty, and proceeded to trial by jury.  On February 29, 2008, following twenty-seven court days of trial, the jury returned guilty verdicts on all three counts.  The jury found the defendant guilty of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 1), possession or attempted possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 2), and receipt or attempted receipt of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 3).  Dkt. #234.  The defendant has filed a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial under Rule 33.  Responses and replies have been filed.

The Court will first provide background information concerning the legal standards applicable to the defendant's motion and the charges and evidence presented at the trial of this case.  The Court will then address the defendant's arguments concerning the evidence seized under the search warrant, prosecutorial misconduct, and handling of the experts at trial. The Court will conclude by addressing the defendant's concerns regarding the Court's various trial rulings.  For reasons the Court will explain below, the defendant's motion for acquittal or a new trial is denied on all grounds.

I.  APPLICABLE LEGAL STANDARDS

A motion for judgment of acquittal made or considered after

1   a jury has returned a guilty verdict should be denied if,

2   "viewing the evidence in the light most favorable to the

3   government, a rational trier of fact could have found the

4   defendant guilty beyond a reasonable doubt." United States v.

5   Hector, 474 F.3d 1150, 1156 (9th Cir. 2007) (citing Jackson v.

6   Virginia, 443 U.S. 307, 319 (1979)).  In evaluating a motion for

7   acquittal, a court must be "highly deferential" to the jury's

8   verdict.  United States v. Dearing, 504 F.3d 897, 900 (9th Cir.

9   2007).  The court may neither weigh the evidence nor assess the

10  credibility of witnesses.  United States v. Beverly, 369 F.3d

11  516, 532 (6th Cir. 2004).

12      Under Federal Rule of Criminal Procedure 33(a), a trial

13  court may vacate a judgement and grant a new trial "if the

14  interest of justice so requires."  If the court concludes that,

15  despite the abstract sufficiency of the evidence to sustain a

16  verdict, the evidence preponderates sufficiently heavily against

17  the verdict such that a serious miscarriage of justice may have

18  occurred, it may set aside the verdict, grant a new trial, and

19  submit the issues for determination by another jury.   United

20  States v. Kellington, 217 F.3d 1084, 1087 (9th Cir. 2000).  As a

21  matter entrusted to the discretion of the trial judge, a motion

22  for new trial should be granted only in "exceptional cases in

23  which the evidence preponderates heavily against the verdict."

24  United States v. Pimental, 654 F.2d 538, 545 (9th Cir. 1981).

25  II.  BACKGROUND

26      The jury's verdict in this case was supported by substantial

27

3

evidence of the defendant's guilt.  What follows is a summary of some, but not all, of that trial evidence.

Count One charged the defendant with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) based on his possession of a CD-Rom labeled "Backup" which was found in his personal photography studio in Clovis, California, during the execution of a valid search warrant on November 3, 2005.  The "Backup" CD contained a selection of images and videos depicting the sexual abuse of actual minors taken from a larger set of images and videos the defendant had collected on two Zip Disks when he was working as a Detective in the Sex Crimes Unit at the Fresno County Sheriff's Department and participating in the federal prosecution of United States v. David Armenta, CR-F-01-5013 OWW.[2]  Compare Trial Exhibits 20 and 24.  The evidence at trial showed that the defendant was transferred out of the Sex Crimes Unit effective June 11, 2001, however, and that his transfer preceded both the manufacture of the "Backup" CD in Taiwan (which witness testimony established took place on October 29, 2001), and the burning of the child pornography images and videos to the "Backup" CD (which expert forensic testimony established took place on October 6, 2002).[3]  Thus, the evidence

_____

[2] Armenta was sentenced and waived all appellate and habeas rights on February 21, 2002.

[3] Witness testimony at trial established that after leaving the Sex Crimes Unit, the defendant was promoted to Sergeant and had no further involvement in the investigation of child pornography-related cases.  As a Sergeant, the defendant was assigned to Fresno County Sheriff's Department Area 2, and later to Area 1, both of

4

at trial showed that On October 6, 2002, when the "Backup" CD was created, the defendant had no legitimate work-related reason to access child pornography.

Through expert forensic testimony by Mr. Richard Kaplan of the Department of Justice Criminal Division's High Technology Investigative Unit, the government established at trial that the contents of the "Backup" CD were burned or attempted to be burned to a new CD on July 7, 2005, using the computer the defendant kept at the apartment he shared with Ms. Ramona Ramirez.  Trial Exhibits AQ.2 (Item 3, Section 2 on p. 8) and 168.  The defendant maintained throughout the trial that Ms. Ramirez had "set him up" and that she was the individual responsible for the "Backup" CD, which was found at his photography studio, and for the downloading and viewing of the child pornography images charged in Counts Two and Three (discussed in detail below).  To the contrary, the evidence at trial established that Ms. Ramirez was at work on July 7, 2005, when the "Backup" was burned or attempted to be burned.  Trial Exhibits 157, 146, 147 and 118. Forensic evidence presented at trial also revealed that just over an hour after the burning or attempted burning of the files from

which are located in buildings separate from the building where the Sex Crimes Unit was housed.  The defendant later filed several disability-related claims with the Sheriff's Department, and his last day of active duty was August 6, 2004.  After taking disability leave from the Sheriff's Department, the defendant operated a professional photography business called "Ronald B. Vaughn, Jr. Photography" out of a rented studio.  It was at that studio that the defendant's personal laptop computer and the "Backup" CD were recovered on November 3, 2005.

the "Backup" CD on July 7, 2005, the defendant accessed and saved

his password to the Costco photograph development website using

that same computer.   Trial Exhibits 176 and 177.

The government also proved that on April 7, 2005, again,

while Ms. Ramirez was at work, the defendant viewed at least

eight child pornographic videos saved to the "Backup" CD using

his personal laptop computer –- just minutes after he saved a

picture of his then-eight year-old daughter Ellie to that

computer and minutes before he added an appointment in the

calendar function of the software program Microsoft Outlook

relating to photographing the "Richardson Engagement."   Trial

Exhibits 65, 116, 115, 118 and 157.

Counts Two and Three charged the defendant with possessing

or attempting to possess child pornography in violation of 18

U.S.C. § 2252(a)(4)(B) and receipt or attempted receipt of child

pornography in violation of 18 U.S.C. § 2252(a)(4)(B), based on

evidence contained within a "Thumbs.db" file found on the

defendant's personal laptop computer.[4]   On the defendant's

computer, the Thumbs.db file was located within a download-

related folder within the software program BearShare.[5]   The

---

[4] A "Thumbs.db" file is a Microsoft Windows system-created
database file that is automatically saved when a user of the
computer chooses the "Thumbnail" view option while reviewing files
saved within a folder.

[5] BearShare is a peer-to-peer file sharing program that enables
users with the same or compatible software to connect digitally via
the Internet and search and share one another's files based on
their titles and descriptions.

Thumbs.db file found in the defendant's BearShare download-related file contained images depicting actual minors engaged in sexually explicit conduct titled "Pedo PTHC - 9.jpg," "preteen boy fucks - Mom Fucking pthc).jpg," "PTHC Ultra Hard Pedo Child Porn Pedofilia (New) 052.jpg," "PTHC Ultra Hard Pedo Child Porn Pedofilia (New) 054.jpg," "PTHC Ultra Hard Pedo Child Porn Pedofilia (New) 064.jpg," and "pthc-collection of pedo pics016.jpg".  Trial Exhibits 37, 118, 169.1-169.6 and 67.1.

Expert forensic testimony by Mr. Kaplan established that these images were downloaded via BearShare and viewed as Thumbnail images on August 24, 2004, again while Ms. Ramirez was at work, and over three years after the defendant stopped investigating child pornography offenses for the Fresno County Sheriff's Department.  Trial Exhibits 67.1, 118 and 157.  It was also established at trial through the testimony of multiple witnesses that the acronym "PTHC," which is present in each of the child pornography file titles found in the Thumbs.db file on the defendant's computer, stands for "pre-teen hard core" and is a term commonly associated with child pornography.  From this, the jury could infer that the defendant was familiar with this and other terms indicative of child pornography, based on statements he made in reports written when he was a Sex Crimes Unit Detective.  Trial Exhibits 160 at p. 6, 163 at p. 3 (Fresno County Sheriff reports written by Defendant evidencing that the defendant was able to identify images of child pornography by their file titles alone).  Thus, the evidence at trial

7

established that on August 24, 2004, the defendant used BearShare

to knowingly receive the six child pornography images, thumbnail

copies of which were later recovered from the Thumbs.db file.

The government proved the defendant's knowing possession of those

six images through the existence of the "Thumbs.db" file, which

was automatically created by Windows when the defendant opted to

view those files as thumbnails, and by Mr. Kaplan's testimony

that the original images were not recovered (indicating that they

had been deleted, possibly after being saved to another storage

device).   In response to Defendant's claims that he was not

responsible for the downloading of the charged images or the

transfer onto his personal laptop computer of the Thumbs.db file

in which copies of the charged images were found, the

government's evidence showed that the BearShare program and

affiliated files were transferred to the defendant's personal

laptop computer at the same time as files he created and software

programs he registered to his photography business.   Trial

Exhibits 35, 100, 101, and 115.   Finally, to prove the children

depicted in the charged images and videos were, in fact, real

children, the government presented testimony from law enforcement

officers who met one of the child victims depicted on each the

"Backup" CD and within the "Thumbs.db" file and moved into

evidence the victims' birth certificates.   Trial Exhibits 63, 65,

6, 11.2, and 57.

　　　　The government also presented extensive 404(b) evidence,

based on which the jury could find that the defendant had the

motive, opportunity, intent, and knowledge to commit the crimes

for which he was convicted, as well as that those crimes did not

result from any mistake or accident by the defendant.   That

evidence included a text story found in the defendant's

possession describing an adult engaging in sexually explicit

conduct with a child.   Trial Exhibit 1A.   Ms. Ramirez testified

that while living with the defendant in the summer of 2004, she

found files with titles indicative of child pornography on the

defendant's old computer and when she confronted him about it, he

admitted "he had a problem," agreed to go to counseling, and

thereafter bought a new computer to which he would not give her

access for more than a few minutes at a time.

Dan Eagle, a couple's therapist who counseled Ms. Ramirez

and the defendant, testified that the defendant admitted during

one session that he was interested in "teen pornography".

Evidence was also presented showing that the defendant was on

notice not to improperly store or possess child pornography, as a

result of an Internal Affairs investigation conducted by the

Fresno County Sheriff's Department following the defendant's

storage of child pornography on his personal computer network

drive when he worked in the Sex Crimes Unit.   The jury also heard

testimony from a former colleague of the defendant who testified

that while working as a Detective for the Sheriff's Department,

the defendant had once bragged that he had a very attractive 16

year-old foreign exchange student living with his family and

sometimes on Sunday mornings he would pretend to be sick so he

could stay home from Church and spend time alone with her.

Voluminous computer forensic 404(b) evidence was also presented from each of the three computers to which the defendant uniquely had access.  On the computer the defendant shared with his ex-wife, Ms. Christine Champion, the evidence showed that user "Ron" had visited websites with titles indicative of child pornography as early as July 7, 2001, and September 11, 2001. Trial Exhibit 91 at pp. 10 and 24.  That same computer was also shown to have been used to download or attempt to download many files with titles indicative of child pornography.  Trial Exhibits 171, 178, 172, 86, and AQ.2 (Item 4, Section 4 at p. 13).  Purposely saved to the computer the defendant shared with his ex-wife was a file with text from a website featuring links to and descriptions of other sites indicating that they contained child pornography -- a file which the jury learned was saved to the computer on December 3, 2001, the defendant's own birthday. When she testified at trial, the defendant's ex-wife denied being responsible for any of the above computer activity that was associated with child pornography.  All of this evidence predated the defendant's decision to leave his ex-wife, rent an apartment, and live with Ms. Ramirez beginning in December 2002.

The computer housed at the apartment the defendant shared with Ms. Ramirez was likewise shown to have been used to download or attempt to download three files with titles indicative of child pornography.  Trial Exhibit 128.4.  In addition, the defendant's laptop was shown to have been programmed so it would

10

1   not save evidence of the user's Internet browsing activity.

2   Trial Exhibit 75.   The government presented evidence showing that

3   the defendant's laptop was used to download four movie files with

4   titles clearly indicative of child pornography as recently as

5   October 12, 2005 (less than one month before the search of his

6   photography studio).   This downloading occurred while Ms. Ramirez

7   was at work.   Trial Exhibits 156.1, 118 and 157.   Mr. Kaplan

8   testified that within 23 minutes after the videos were downloaded

9   to the defendant's personal laptop, the user of the computer

10  visited the "PhotoReflect" website -- a site the evidence

11  established was frequently visited by the defendant for his

12  photography business.   Trial Exhibits 156.1 and 185.   Finally,

13  the government presented extensive testimony establishing that

14  the defendant's personal laptop computer, and the BearShare

15  program he installed and made payments toward, was used to search

16  and download files with titles indicative of child pornography.

17  Trial Exhibits 37, 130 at p. 1833, 178, 28, 29.

18        The evidence presented at trial was substantial and

19  compelling, and through its admission the government proved

20  beyond a reasonable doubt that the defendant committed the crimes

21  for which he was charged.   In addition to rebutting the

22  defendant's claim that Ms. Ramirez had "set him up," the

23  government also established at trial that the defendant's receipt

24  and possession of the charged images was in no legitimate way

25  connected to his work for the Fresno County Sheriff's Department.

26  The defendant had left the Sex Crimes Unit before any of the

27

11

above-described activity took place and even when he was there, none of the investigations on which he worked involved the peer-to-peer file sharing program BearShare.  In addition, witness testimony from the law enforcement officer who conducted the original investigation into three of the images found in the "Thumbs.db" file found on the defendant's personal laptop computer, established that those images did not exist (i.e., they had not yet been produced) when the defendant worked in the Sex Crimes Unit.

III.  DEFENDANT'S CLAIMS

     A.   Evidence Seized Under the November 3, 2005 Search
          Warrant

     The defendant has argued that the evidence seized during the November 3, 2005, search should have been suppressed.  The defendant filed a motion to suppress and the Court held an extended *Franks* suppression hearing to consider the evidence and arguments of both parties.  The defendant claimed that false information was provided by an ICE agent to the magistrate judge who issued the search warrant, and that additional information which constituted a material omission was improperly excluded. The author of the search warrant affidavit was Special Agent Michael Prado of ICE, who admitted he erred by writing that the defendant was in possession of child pornography instead of saying that there was probable cause to believe that was true (as he wrote repeatedly elsewhere throughout the affidavit).  The Court did not find, however, that Special Agent Prado's error

reflected an intentional attempt to mislead the magistrate.  Nor does the Court find that the magistrate was misled.  The affidavit accurately described the titles and status of four movie files found by Special Agent Prado and Detective Kevin Wiens of the Fresno County Sheriff's Department during their consensual search of the defendant's personal laptop computer. The movie files shared the same title, (Hussyfan)(pthc)(r@ygold) (babyshivid) Little and dad (Daddy's in love with my 6yo pussy AND SO AM I!!) (Realit[1].mpeg, and unanimously Special Agent Prado, Detective Wiens, Mr. Kaplan, and even the defendant's computer forensic expert David Penrod, agreed that a file with that title is indicative of child pornography.

Further, the evidence presented at the *Franks* hearing made clear that Special Agent Prado was correct to describe at least three of those files as deleted but possibly recoverable.  Mr. Penrod's contrary opinion expressed in an affidavit he signed to support defendant's motion, which he later disavowed as he agreed that the four movie files were at one time saved to the computer and he, too, would have sought to obtain a search warrant if he were investigating this case in place of Special Agent Prado and Detective Wiens.  Sufficient information about the potential bias of Ms. Ramirez was included in the search warrant affidavit, which disclosed she was a former cohabitant, and that the omission of any additional information that may or may not have been conveyed by the defendant was not material to the magistrate's probable cause determination.  For all the reasons

stated in the ruling following the *Franks* hearing, the evidence established that there was no misconduct or intentional falsehood or omission and that the issuance of the search warrant was well supported.

   B.   Scope of the Cross-Examination of the Defendant During the *Franks* Hearing

   The defendant has argued that the extended cross-examination of the defendant during the *Franks* hearing had a chilling effect which affected the trial.  The defendant took the stand at the *Franks* hearing to contradict certain aspects of the accounts of the knock-and-talk and consensual search, testified to by Special Agent Prado and Detective Wiens.  The defendant also testified that he provided Special Agent Prado and Detective Wiens with information about the potential vengeful and biased attitude of Ramona Ramirez.  Defendant's counsel later asserted this constituted a material omission from the affidavit.  While it is true that the defendant was questioned at length about these and related topics, it was the defendant who raised these issues, putting his own credibility into issue, and that he did so after being fully advised that his testimony at the pre-trial hearing would not be admitted at trial unless he took the stand again and testified inconsistently.

   The defendant has failed to identify any particular subjects or questions inquired into by government counsel during the suppression hearing that were allegedly beyond the scope of the testimony he willingly gave or were not otherwise relevant to

Defendant's credibility at the *Franks* hearing.  <u>Arredondo v.</u>
<u>Ortiz</u>, 365 F.3d 778, 783 (9th Cir. 2004) ("There is no question
that a witness's credibility is properly subject to exploration
once he takes the stand.").  As the Ninth Circuit explained in
<u>United States v. Vasquez</u>, 858 F.2d 1387, 1392 (9th Cir. 1988):

> Federal Rule of Evidence 611(b) commits the scope of cross-
> examination to the trial judge's discretion.  <u>See</u> <u>United</u>
> <u>States v. Miranda-Uriarte</u>, 649 F.2d 1345, 1353 (9th Cir.
> 1981); <u>United States v. Green</u>, 648 F.2d 587, 594 (9th Cir.
> 1981).  In exercising this discretion, the trial court may
> permit cross-examination "as to all matters reasonably
> related to the issues [the defendant] put in dispute by his
> testimony on direct."  <u>Miranda-Uriarte</u>, 649 F.2d at 1353;
> <u>Green</u>, 648 F.2d at 594 (same).

In <u>Vasquez</u>, the defendant argued that because his direct
testimony addressed only the events surrounding his delivery of
five kilograms of cocaine to the undercover officer, it was an
abuse of the court's discretion to permit cross-examination
concerning the 25 kilograms of cocaine, paraphernalia and $85,000
in cash found in his apartment.  <u>Vasquez</u>, 858 F.2d at 1392.  The
Ninth Circuit disagreed, finding instead that because the
defendant's testimony addressed the events leading up to his
arrest, including the time he left his apartment and whether he
was accompanied at the time, the items found in his apartment
were "reasonably related" to Vasquez's direct testimony.
<u>Vasquez</u>, 858 F.2d at 1392.

   The same is true in this case.  The defendant testified at
the suppression hearing about information he allegedly provided
to Detective Wiens and Special Agent Prado on the day he

consented to their search of his laptop computer; most notably,
he claimed to have provided them with extensive information
calling into question the credibility of the complaining witness,
his ex-girlfriend Ms. Ramona Ramirez.  On cross-examination, the
government asked the defendant about those and other statements
Defendant made on the day of the search; explored his
relationship with Ms. Ramirez; the veracity of his claim (made on
the day of the search and reiterated while questioned under oath)
that Ms. Ramirez had "set him up" (and was therefore responsible
for the child pornography-related evidence found in his
photography studio and on various computers to which he had
access); and inquired into other subjects reasonably related to
his direct testimony or pertinent to his credibility.

The defendant was warned, by one of the prosecutors, the day
before taking the stand that government counsel anticipated
extensive cross-examination.  When defense counsel questioned how
the government's cross-examination could possibly span hours
longer than his direct, the prosecutor explained, and the Court
agreed, that matters relevant to the defendant's credibility
would be proper subjects of inquiry.  Despite this warning, the
defendant chose to take the stand knowing that, although his
testimony in support of the suppression motion would not be
admitted against him at trial on the issue of guilt, Simmons v.
United States, 390 U.S. 377, 394 (1968), it would be admissible
to impeach his credibility if he offered testimony inconsistent
with his prior testimony.  As the Ninth Circuit explained in

16

United States v. Beltran-Gutierrez, 19 F.3d 1287 (9th Cir. 1994),

Defendant:

> [W]as not forced to testify at his suppression hearing.
> He did so voluntarily in order to preclude the use of
> incriminating evidence at his trial. Thus, he did not
> face 'the cruel trilemma of self-accusation, perjury or
> contempt.' Murphy v. Waterfront Comm'n, 378 U.S. 52,
> 55 . . . (1964). [Defendant] cites no authority to
> support the proposition that a defendant's decision to
> take the stand to protect a constitutional right
> precludes the use of his testimony for purposes of
> impeachment. The Supreme Court has instructed us that
> "every criminal defendant is privileged to testify in
> his own defense, or to refuse to do so. But that
> privilege cannot be construed to include the right to
> commit perjury." Harris v. New York, 401 U.S. 222, 225
> . . .(1971).

Beltran-Gutierrez, 19 F.3d at 1291. Contrary to his assertion,

the defendant's right to testify at trial was not impeded by the

answers he gave under oath in support of his motion to suppress.

Instead, those answers merely exposed him to impeachment if his

trial testimony was *inconsistent* with his testimony at the

suppression hearing. The defendant cannot complain that his

strategic choice to testify at the suppression hearing enabled

the government to obtain "information that tended to incriminate"

him or "prejudice his defense for trial." Defendant's Motion at

p. 13:10-11.

     C.   Prosecutorial Misconduct

     The defendant has moved for a new trial on the ground that

various forms of alleged prosecutorial misconduct combined to

result in violations of his rights to a fair trial and due

process. The defendant has complained about the government's

17

1 objections and claims that during trial the government

2 disregarded the Court's evidentiary rulings.

3      In order to prevail on a claim of alleged prosecutorial

4 misconduct, a defendant must show that his due process rights

5 were violated in way that the prosecutor's misconduct rendered

6 the trial "fundamentally unfair." Darden v. Wainwright, 477 U.S.

7 168, 181 (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982).

8 The Ninth Circuit has held that it will reverse convictions "only

9 where the prosecutor's statements 'so infected the trial with

10 unfairness as to make the resulting conviction a denial of due

11 process.'" United States v. Atcheson, 94 F.3d 1237, 1244 (9th

12 Cir. 1996) (quoting Darden, 477 U.S. at 181). As this Court

13 acknowledged in denying the defendants' motion in United States

14 v. Nobari, 2006 WL 2535052, 2006 U.S. Dist. LEXIS 66079 (E.D. Ca.

15 August 31, 2006) (J. Wanger):

16
17      A claim of prosecutorial misconduct must be evaluated
        in the entire context of the trial. United States v.
        Cabrera, 201 F.3d 1243, 1246 (9th Cir.2000) (citations
18      omitted). Reversal on this basis is justified only if
        it appears more probable than not that the
19      prosecutorial misconduct materially affects the
        fairness of the trial. Id. In making this assessment,
20      a court looks to several factors, not only the impact
        of the prosecutor's remarks, but also Defense counsel's
21      opening salvo. United States v. Weatherspoon, 410 F.3d
        1142, 1150 (9th Cir.2005); see also United States v.
22      Young, 470 U.S. 1, 12-13 (1985). If the prosecutor's
        remarks were "invited," and did no more than respond
23      substantially in order to "right the scale," such
        comments would not warrant reversing a conviction.
24      Young, 470 U.S. at 12-13.

25 Nobari, 2006 WL 2535052 at *2, 2006 U.S. Dist. LEXIS 66079

26 at *7.

27
                                18

The context in which the disputed exchanges between counsel arose in this case must be examined.  Further, Defendant knew that he presented evidence that invited a response by contention, conduct, or action, he could not expect the government not to respond.  The trial of this case was highly contentious.  The Court calmly and deliberately ruled on an equally large number of objections from both the prosecution and the defense throughout the trial.  None of the many objections throughout the trial were unjustified.  Impartial rulings were made on the merits of all objections, in such a manner that the jury was not improperly influenced by the conduct of any attorney.  The majority of disputes between counsel occurred outside the presence and hearing of the jury.  Accordingly, there were no issues that would justify granting a motion for acquittal on these grounds.

D.   Alleged Improper Vouching for Ms. Ramona Ramirez

Ramona Ramirez was the complaining witness whose disclosure of information about the defendant's apparent interest in child pornography prompted law enforcement officers to focus attention on the defendant.  She met the defendant when she was working as a waitress in Fresno County.  Ms. Ramirez and the defendant formed a friendship at that time that led to a romantic relationship.  The relationship eventually ended poorly, and the defendant attempted to show that Ms. Ramirez was vengeful and vindictive.  The defendant claims that the government vouched for the credibility and honesty of Ms. Ramirez by allegedly suggesting that she could be trusted by the jury because she was

19

a government witness.  Almost half of the defendant's entire

argument, however, involved defense counsel subjecting this

witness to unrelenting and continuous personal attacks, six

defense witnesses were called, and other evidence was presented

to impeach and attack Ms. Ramirez's credibility.  Because any

witness who testifies, places her credibility in issue, all of

this wide-ranging cross-examination, consuming at least two days

of trial, was permitted.  The government's presentation of

testimony from this witness was entirely justified.  There was no

invocation of governmental status or weight associated with the

witness, as she was a private citizen who had no status with the

government.  The government's treatment of Ms. Ramirez was

justified by the law and the evidence.

> E.   Alleged Intimidation / Improper Impeachment of Defense
>      Witnesses Penrod and Jura

The defendant has claimed that the prosecution's conduct in

disregarding evidentiary rulings had a prejudicial effect on the

defendant's case.  He also has claimed that the government

improperly obtained and used documents pertaining to defense

witnesses David Penrod and Vince Jura.  The defendant has

presented no evidence to support the allegations that the

government violated any state, federal, or local regulation, law,

or other legal authority by the way it obtained or used potential

impeachment evidence against witnesses Penrod or Jura.

The defendant has claimed that the cross-examination of his

20

forensic computer expert witness, David Penrod, regarding the circumstances of his testimony (i.e., work and opinions in other cases) invaded his status as an ex-government customs agent.  An extended Rule 103 hearing was held outside of the presence of the jury to determine the issue of Mr. Penrod's status as a former U.S. government employee.  Mr. Penrod was only questioned by the prosecution on issues that were directly and materially related to bias and the nature, extent, and timing of Mr. Penrod's work on this case and other cases where he appeared as an adverse expert witness to the government.

The government confronted Mr. Penrod with a decision from a Merit System Protection Board (MSPB) judge on January 3, 2008, during his testimony at a pretrial hearing on the Defendant's Motion to Suppress evidence -- over two weeks before the jury heard opening statements in the trial.  Further, the government provided defense counsel with a copy of the MSPB decision during the cross-examination of Mr. Penrod, and defense counsel was given an opportunity to have Mr. Penrod explain the circumstances of his removal from the U.S. Customs Service.  The Court ruled that the government properly confronted Mr. Penrod with the circumstances of his removal by his former employer, because it was the same federal agency that was responsible for investigating and assisting in the prosecution of the defendant.  Thus, Mr. Penrod had a potential bias that was the proper subject of cross-examination by the government.  However, other limitations were imposed.

The defendant filed a motion in limine on January 14, 2008, to preclude the government from impeaching Mr. Penrod at trial by referring to the fact that the U.S. Customs Service had terminated his employment.  Dkt. # 144.  After a hearing on the motion, outside the presence of the jury, the Court limited the government as to how it could impeach Mr. Penrod with information related to his employment by and separation from U.S. Customs. Specifically, in an order dated January 15, 2008, the Court ruled that because Mr. Penrod had negotiated a settlement that changed his termination to a resignation, the government would not be allowed to present evidence that he had been terminated by the agency.  Dkt. # 157.

The Court later ruled orally that Mr. Penrod could be impeached with reference to his prior history of discipline by U.S. Customs, only if he relied on his background and experience as a federal law enforcement officer in his testimony.  The Court recognized that the Agency, in the settlement agreement, had refused to expunge that record or preclude its subsequent use.[6] The Court also approved the government's reference to Mr. Penrod's own volunteered statement that it "was very painful" to lose his law enforcement badge,[7] so that the jury was not left

---

[6] The government apparently did not pursue this potential impeachment of Mr. Penrod during his trial testimony, because he did not appear to rely on his background and experience as a former federal law enforcement officer.

[7] During the hearing on Defendant's Motion to Suppress, Mr. Penrod was asked the following question by government counsel:

22

with the false impression that he wanted to leave Customs.  The
government did not violate any of the Court's rulings regarding
Mr. Penrod's background, and the defendant points only to one
example of the government's adherence to, rather than
noncompliance with, the Court's rulings.  Defendant's Motion at
p. 18:18-22.

The civil settlement agreement between the government and
Mr. Penrod was not breached and he was not examined on any areas
that did not bear directly on his bias, education, training,
experience, or competence.  Using Penrod's admission that it was
painful to give up his law enforcement position during his cross-
examination did not violate this Court's ruling and was
permissible cross-examination on his possible bias.  He left his
employment with United States Customs, a predecessor agency to
United States Immigration and Customs Enforcement, an agency
responsible for the prosecution of the case in which he was
testifying.  The Court is satisfied that the cross-examination of
Mr. Penrod regarding his past work and expert opinions was
proper.  Each side conducted many hours of cross-examination if
the forensic experts and used them appropriately to advocate for
their respective sides.

Similarly, the defendant moved in limine on January 15,

---

"When they terminated you, you appealed that decision because you
wanted to keep your job."  Mr. Penrod responded: "Yes. I loved
working for US Customs. It was -- the termination was extremely
painful to me. To lose that badge was very painful."

2008, to exclude wrongful acts by his investigator, Vincent Jura. Dkt. # 147.  This was in response to the government's disclosure in discovery of information related to Mr. Jura's former employment by the California Department of Justice as well as law enforcement reports related to alleged criminal activity by Jura unrelated to his employment.  The Court held a hearing on Defendant's motion, and the government indicated that it had merely provided the information about Mr. Jura in advance of his possible trial testimony, so that if it were used to impeach him, the defendant could not claim surprise.  The Court then ruled that absent "admissible evidence under Federal Rule of Evidence 608(b), 609 or 404(b), no such evidence about Mr. Jura shall be referred to or offered in the presence of the jury without prior notice to the Court, outside the presence of the jury."  Dkt. # 157.  The defendant never called Mr. Jura as a witness, and his complaint that "the prosecutor intimidated the Defendant's investigator with confidential employment and law enforcement documents" is completely without merit.  Defendant's Motion at p. 16:1-3.[8]

///
///

_____

[8] Defendant's reliance on California Evidence Code §§ 1040-1045 is misplaced.  Defendant's Motion at p. 16:3-4.  The provisions to which the defendant cites govern a defendant's access to a peace officer's records of complaints and/or discipline imposed in state court proceedings.  The cited statutes are particularly irrelevant for Mr. Penrod, who, when he testified, was a resident of Colorado and not a law enforcement officer.  He previously was a federal law enforcement officer in Arizona.

F.   <u>Defense Experts' Inability to Reasonably Access
Evidence</u>

The defendant has requested a new trial on the ground that his defense experts were denied reasonable access to evidence related to the charges and were therefore unable to conduct forensic examinations or prepare informed opinions, resulting in prejudice and an unfair trial.

The original expert witness for the defense, James Edmiston, has been convicted and sentenced for two counts of perjury.  One of those counts related to false statements that he made in connection with this case.  He misrepresented his education, qualifications, abilities, and experience.  James Edmiston was then replaced by David Penrod, an expert in computer forensics retained by the defense in early 2007.  Defense counsel met Penrod at a conference in San Diego and discussed this case with him then.

The defendant has claimed that David Penrod was denied access to forensic computer evidence. The Court has found, based on representations from government counsel and witnesses, that the defendant had access to the government's evidence from the time that Penrod was retained through the time of trial.  In addition, the experts for both sides were permitted to remain in the courtroom at all times and to hear the testimony of all witnesses.  They were given hundreds of hours to work, and they did work throughout the seven week trial, including on nights and weekends.  At one point, when the relevance of a particular DVD

25

became known, the Court ordered that it be shipped to the
Colorado ICE office, so that Mr. Penrod could review it there
rather than at the ICE office in Fresno.  The government complied
with that order.

E-mail messages that defense counsel Richard Berman attached
to the Defendant's Reply to the Government's Response to the
Defendant's Motion for New Trial, show that it was government
counsel who first broached the issue of Mr. Penrod having access
to evidence during his trip to Fresno in early January.
Specifically, government counsel asked on Friday, December 21,
2007, in a message at 3:11 p.m. whether defense counsel
anticipated "asking for any additional time for Mr. Penrod to
reexamine evidence in light of the discovery [provided by the
government] this week?"  Prior to then defense counsel had not
sought access to the material for Mr. Penrod for his trip to
Fresno in early January 2008.

Defense counsel, after 5:00 p.m. on Friday December 21,
2007, requested – for the first time – access to "all the
materials you previously provided for his examination."  This
clearly confirms that the defendant's expert had previously been
granted full access to the requested material.  Defense counsel
then asked that Mr. Penrod be given access "at the ICE Office on
January 2, 2008."  The next four days were weekend days and/or
federal holidays, yet government counsel, on Christmas Day 2007,
informed defense counsel that Detective Wiens had been asked to
make the requested material available again as soon as possible

26

upon his return to his office on January 2, 2008.  Defendant's
Reply, Exhibit B.

Mr. Penrod appeared at the ICE office on January 2, 2008,
after he purchased a hard drive onto which Detective Wiens could
provide a copy of the requested evidence.  Notably, after
reviewing the mirror images provided previously, Mr. Penrod had
requested that Detective Wiens *wipe the copy* of the evidence
previously provided.  Presumably this request was made because
defense counsel was concerned that the government would attempt
to "reverse engineer" any analysis that Penrod had done on the
drive to anticipate the defendant's strategy at trial.  As a
result of the government's prior compliance with that request,
however, Detective Wiens had to create whole new copies of the
hard drives to which the defendant sought access -- a process
that takes several hours per computer, depending on the amount of
data stored thereon.  Detective Wiens completed the copying
process as promptly as possible (indeed, the government incurred
the expense of paying him overtime to make the evidence available
for review after hours) but then Mr. Penrod appeared at the ICE
office and reported that he did not have the necessary dongle
(which would be needed to operate his copy of forensic software).
Because it would have been a violation of intellectual property
laws and because he would have been providing a law enforcement
version of the software to an unauthorized person, Detective
Wiens did not provide his dongle to Mr. Penrod.  Mr. Penrod then
chose to leave the ICE office and returned the next day.

Thereafter the Court granted defense counsel's request for additional time to conduct a forensic examination of the evidence.  See Docket Item 132.  And as the government noted in its response, the defendant opposed the government's repeated requests for one or two day continuances of the trial and informed the Court that the defendant was prepared to proceed. In fact, the defendant complained on numerous occasions about the length of time that had passed between the return of the initial indictment and trial.  Response at 16, lines 20-24.

Finally, David Penrod repeatedly answered the Court's inquiries into why he did not review the evidence earlier by simply stating that he did not have the time due to other cases and personal commitments.  The Court is satisfied that no opinion by the experts went unexpressed and that all the necessary time and opportunity was given to all experts to present all evidence on both sides.  The defendant's motions on these grounds relating to experts are denied.

The Court precluded under Fed. Evid. 403 testimony about the government sending a copy of the hard drive from the defendant's laptop computer to James Edmiston and then being returned to the government during discovery more than a year before the trial. The defendant claims there was significance to the government turning over a copy of the drive, because, according to the defendant, the government believed at that time that there was no contraband located on that hard drive.  After additional forensic examination of that hard drive was performed, contraband was then

located, specifically six thumbnail images of child pornography. The defense was provided with a duplicate image of the hard drive within the confines of the Fresno ICE office. The defendant failed to prove that a copy of a hard drive containing contraband was turned over to the defense after enactment of the Adam Walsh Act. Unless the defendant established this fact, his argument about whether or not the government had discovered the contraband had no relevance. There was failure of proof by the defendant on this issue.

More important, however, is that this evidence was properly excluded under Rule 403. The government never argued that there were images of child pornography on the defendant's laptop computer at the time that it was seized by law enforcement, that were viewable without the assistance of forensic or other software. The government's forensic expert clearly explained, and the government argued, that someone using the defendant's computer had downloaded six images of child pornography by using the BearShare peer-to-peer program. That user viewed these six files in thumbnail view, and the original images were then transferred to a different location or deleted. The evidence presented at trial – on this issue – was in the form of a thumbs.db file, and expert testimony thoroughly explained the significance of this evidence. In essence, it was an electronic surveillance camera that represented evidence of a user of the defendant's laptop computer having received and possessed images of child pornography. The expert trial testimony clearly

revealed that the original images were not on the computer; only circumstantial evidence that such images had previously been there, was recovered and presented.  The fact that the thumbs.db file was or was not viewable was simply not relevant to any issue that the jury was asked to decide.  This did not constitute an "adoptive admission" against the government; the proposed evidence was properly excluded. It would have been a waste of time, collateral, and led to unnecessary confusion to permit the defense testimony to raise the issue that a copy of the hard drive from the defendant's laptop was turned over in discovery to a previous defense expert.

G.   <u>Designated Experts</u>

The defendant has claimed that the prosecution was allowed to present expert testimony from witnesses who were not designated as experts, and that the defense expert witnesses were denied the opportunity to testify, resulting in denial of the defendant's right to due process and a fair trial.

The government's initial designated expert was Detective Kevin Wiens, but the government amended its designation once the trial was continued at the defendant's request in the fall of 2007.  Mr. Richard Kaplan then became the testifying forensic expert.  Detective Wiens accordingly became designated as a percipient expert, and his testimony was limited to his investigation including his participation in a consent search and execution of a search warrant at the defendant's photography

30

studio.  He also testified about his subsequent forensic

examinations of computers using EnCase.  The government did not

elicit expert forensic testimony on direct; the defendant

attempted to elicit this type of testimony on cross.  The

defendant, in effect, sought to discredit Detective Wiens by

suggesting that he had failed to locate certain items of evidence

that Mr. Kaplan later found, but which were not the subject of

Detective Wiens' investigation and were beyond the scope of his

experience and training.  The government objected to this

strategy, and the Court at sidebar informed defense counsel that

if the defense persisted, the government would be allowed to

present the results of Detective Wiens' forensic examination on

redirect.  Defense counsel conducted an extensive cross on

subjects that Mr. Kaplan covered and were in his designated area

of expertise.  The Court ruled that the defense not only opened

the door, but took it off the hinges.  The government was within

its rights to then elicit testimony from Detective Wiens to cure

the specter that he had not found any evidence supporting the

charged offenses during his review of evidence connected to the

case.  See, e.g., United States v. Segall, 833 F.2d 144, 148 (9th

Cir. 1987) (defense counsel's introduction of cross-examination

evidence creating a false impression that defendant retained in

her bank account funds under investigation "opened the door" to

re-direct testimony that only a fraction of that money was

retained); United States v. Taylor, 716 F.2d 701 (9th Cir. 1983)

(on cross-examination defense counsel's questioning of DEA agent

1   "opened door" for prosecutor to elicit on redirect that innocent

2   third parties were not used to pick up chemicals used in the

3   manufacture of controlled substances).  Defendant has not

4   demonstrated how "the right to fully cross-examine Detective

5   Wiens denied the Defendant a fair trial."  Motion at 21, lines 2-

6   4.  The defendant may, in hindsight, regret opening the door to

7   the government's questioning of Detective Wiens on redirect, but

8   that does not constitute a denial of due process, nor is it any

9   basis for a new trial.  The Defendant was permitted hours of

10  cross-examination of the government's computer forensics experts.

11      The defendant has complained about two additional aspects of

12  Detective Wiens' testimony, neither of which entitle the

13  defendant to an acquittal or a new trial.   The defendant has

14  asserted that on "January 22, 2008, Detective Wiens was allowed

15  to testify to Ramona Ramirez's hearsay statement and to his

16  'assessment of Ramona Ramirez's statement.'" Motion at 28, lines

17  10-12.  The defendant has not identified specifically which

18  statement Detective Wiens allegedly commented on, and this

19  precludes the Court from ruling on the objection.  Nor did

20  Detective Wiens provide "an improper legal opinion" when he

21  testified about Exhibit 1.3; rather he merely identified that

22  document as a list of the files on Exhibit 1, the "Backup" CD.

23  Motion at 28, lines 14-16.  As the Court explained in detail

24  during the morning recess on January 24, 2008, beginning at 10:26

25  a.m., there was no violation of the Best Evidence Rule, a rule

26

27

that was not even implicated by the testimony regarding this exhibit.

The defense and prosecution experts testified for almost forty hours and no stone was left unturned in the defense's cross-examination.  Nights and weekends intervened permitting defense counsel to consult with his computer expert, Mr. Penrod.  Mr. Penrod sat at counsel table and assisted defense counsel with questions during trial when prosecution experts testified.  The Court allowed the defense great latitude in the examination of Detective Wiens, even though he was not a designated expert witness.  The Court initially limited the cross-examination of Detective Wiens in order to prevent undue consumption of time, confusion of issues, misleading of the jury, and repetitive and cumulative testimony on the same subjects.  The Court is confident that there was no error in terms of the depth and breadth of the examination of the experts at trial.  The motion for new trial on this ground is denied.

H.   Sergeant Matt Alexander's Testimony

The defendant has argued that the testimony of witness Sergeant Matt Alexander, who rode along with Sergeant Vaughn when he (Alexander) was a rookie deputy should not have been presented to the jury.  The Court conducted a full Fed. R. Evid. 104(c) hearing on this issue outside the presence of the jury and considered Alexander's testimony before deciding whether to permit the jury to consider it.  The testimony related to the

defendant's inappropriate interest in minor females, and it was offered to rebut the defense's witnesses, at least five, who claimed the defendant had no such inappropriate interest. Sergeant Alexander testified how uncomfortable it was for him to hear the defendant discuss his interest in a 16-year-old female exchange student residing at Defendant's house and how he stayed at home while his family went to church in order to be in the company of the minor.  These comments served the important purpose of showing that the defendant had an inappropriate sexual interest in underage girls in contradiction to testimony from defense witnesses that Defendant had absolutely no interest in children, he was only interested in adult teenagers, and that he could be trusted with their daughters and female relatives.

At the conclusion of the Rule 104(c) hearing, the Court found that the proposed evidence was admissible under Rules 404(b) and 403.  The testimony was relevant, timely, clear, and connected to an incident not too remote from the events at issue in the trial, all bearing on Defendant's intent, lack of mistake, and knowledge.  After giving a tentative ruling on a Friday afternoon, the Court allowed further argument the following week after permitting time for the Court and the parties to research the issue.  The defendant was permitted to cross-examine Sergeant Alexander to his satisfaction and did so.

The Court reasoned that Rule 404(b) is a rule of inclusion, and here admitting the testimony of Sergeant Alexander went to a permissible purpose of showing Defendant's knowledge and intent

34

1   to receive and possess images of minor females as well as his

2   absence of mistake in doing so.  The government argued that the

3   conversation at issue took place in approximately the middle of

4   1994, and conduct related to Count One occurred in October 2002,

5   while the conduct related to Counts Two and Three occurred in

6   August 2004.  The Court agreed that this 8-10 year time span was

7   not too remote.  See <u>United States v. Johnson</u>, 132 F.3d 1279 (9th

8   Cir. 1997) (13 years between defendant's prior sexual contact

9   with teens admissible in prosecution of defendant for

10  transportation of minor with intent to engage in criminal sexual

11  activity); <u>United States v. Grubb</u>, 11 F.3d 426 (4th Cir. 1993)

12  (16 years between prior conduct admitted under Rule 404(b) and

13  charged offenses); <u>United States v. Hadley</u>, 918 F.2d 848 (9th

14  Cir. 1990) (prior sexual abuse of a minor victim ended ten years

15  before prosecution at which evidence was introduced under Rule

16  404(b) not too remote); <u>United States v. Broussard</u>, 80 F.3d 1025

17  (4th Cir. 1996) (evidence of prior conviction admissible even

18  though more than ten years old).  The Court recognized that the

19  defendant had not only put his purported lack of interest in

20  minor females at issue, he took the additional step of asserting

21  that the charges had been fabricated by Ms. Ramirez.  Thus, the

22  proffered evidence was highly probative, not too remote in time,

23  and admissible on the issue of Defendant's knowledge, intent, and

24  absence of mistake.

25      The Court observed that although an admonition regarding

26  Sergeant Alexander's testimony was not required, it was

27

35

advisable.  <u>United States v. Gomez-Osorio,</u> 957 F.2d 636, 641 (9th Cir. 1992).  The Court advised the jury that it was not to consider the defendant's statements to Sergeant Alexander as direct evidence of his commission of any crime(s), but rather the jury could consider the evidence – assuming that they found that the statements were made – for the limited purpose of determining the defendant's knowledge, intent, and/or absence of mistake. The defendant has provided no pinpoint or specific objection to the Court's ruling on this issue.  Admission of this evidence was proper, and it does not provide a basis for the defendant's acquittal or a new trial.

I.   <u>Rule 16 Issues and Rulings</u>

The defendant complains that the Court's Rule 16 decisions regarding David Penrod's testimony were erroneous, arbitrary, and too strictly enforced.  The Court stands by the one or two limits it placed on defense counsel during inappropriate examination of Mr. Penrod.  There is no possibility that Mr. Penrod's direct examination was limited inappropriately.  He was permitted to testify to everything of substance that Defendant sought to elicit.

Discovery during the trial was very lengthy, resulting in the continued expansion of expert testimony throughout the trial. The Court did not limit this in any material way.  The Court required production of an inventory containing descriptions of everything that had been produced under Rule 16 because of the

36

many disputes concerning evidence and the suggestion that counsel or assistants' actions prevented materials from being identified and a foundation for such evidence provided.  Rule 16 provides clear authority for the Court to use reasonable discretion in excluding evidence that has not been designated, turned over, or identified.  Some evidence was excluded under this rule, and some was excluded for other reasons.  This was an appropriate exercise of judicial discretion to maintain the integrity of the discovery process and reliability of the proferred materials.

An issue arose over boxes delivered to Defendant when he left the Fresno County Sheriff's Office.  These boxes were Rule 16 material.  The defendant claimed he had never moved the containers that allegedly were delivered to his residence by the Fresno County Sheriff's Department.  However, Vincent Jura's records indicated that Mr. Jura and the Defendant discussed the boxes on October 7, 2007, at the Defendant's apartment.  This suggests that the defendant knew of and intended to use them as part of his defense at trial.  Regardless, the boxes and their contents were not disclosed as required by Rule 16.

The defendant, his parents, and others all testified as to how the boxes were moved from the defendant's apartment to his parents' home and were eventually taken to defense counsel's office shortly before the trial.  Rule 16 was then triggered, and the Court issued an order to Defendant to maintain that evidence "in its present condition" for reasons of chain of custody and identity and integrity of evidence issues.  The Court eventually

learned that the defendant, or his agents, disobeyed this unambiguous Court order.  The defendant, or his agents, removed items from the containers and mixed items from one container with items from other containers.  From that point forward, the chain of custody, identity, and integrity of the evidence had been compromised.  It was impossible to know whether any particular item had been in any particular container.

When the Court learned that its order had been violated, it entertained arguments from both sides on whether and how certain items of evidence should be admitted.  The Court decided that exclusion of the evidence was too harsh of a sanction, but that given the clarity of the Court's order and the unambiguous violation of it, a proper remedy was to admonish the jury about the violation if the defendant chose to raise the issue of the containers during the trial.  The defendant was on notice that this was the Court's intention, and the Court followed through with its intention by admonishing the jury about the violation of the Court's order immediately after the defendant introduced evidence related to the containers.  The Court carefully considered the interests of both sides and made an appropriate evidentiary ruling based on the record that had been developed. This is no basis for a new trial.

The defendant also has taken issue with the testimony of Lieutenant Neal Dadian, asserting that the Court "erroneously allowed" the testimony, which he claims "constituted improper opinion testimony."  Defendant's Motion at p. 23:24-26.  The

latter contention is mistaken; Lieutenant Dadian testified from his personal knowledge and interactions with Defendant and therefore was permissible opinion testimony by a lay witness. See Fed. R. Evid. 701 (allowing opinion testimony by non-experts if it is "(a) rationally based on the perception of the witness, (b) helpful to . . . the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702").

Lieutenant Dadian was called by the government to testify on February 26, 2008, during the government's rebuttal case.  In addition to testifying that he supervised Defendant, a then-sergeant at the Fresno County Sheriff's Department, from April 2003 to August 2004, Lieutenant Dadian confirmed that the defendant was not responsible for or involved in the investigation of child exploitation or child pornography offenses during that time period.  To rebut the testimony of several witnesses called by the defendant (including his ex-wife Ms. Christine Champion and Fresno County Sheriff's Department Detective Connie Moore, the defendant's former co-worker in the Sex Crimes Unit) who implied that the defendant was extremely hard-working,[9] the government laid foundation for and sought to

---

[9] Ms. Champion testified that while working in the Sex Crimes Unit the defendant was so diligent that he often took work home with him when he was investigating child exploitation offenses. This testimony presented a temptation for the jury to nullify on Count One by offering a seemingly innocent explanation for the defendant's possession in 2005 of a CD containing child pornography images he acquired as a Sex Crimes Detective in 2000.  Lieutenant

admit a performance improvement plan the defendant wrote at

Lieutenant Dadian's request in November 2003.[10]   That performance

improvement plan sets forth six steps that the defendant would

take to improve his performance at the Sheriff's Department,

including addressing the perception that he was an "absent

Sergeant," taking inappropriately long meal breaks, logging off

before his shift ended, and not performing his job functions at

or above expectations.   See Trial Exhibit 30.   Lieutenant Dadian

testified further that he recalls the defendant's performance as

being substandard at first, but Defendant's performance improved

after he submitted the performance improvement plan.   Notably, on

cross-examination, the defendant was able to establish, through

the admission of two performance reviews of his work,

(Defendant's Exhibits D.19 and D.20), that another supervisor

gave the defendant higher marks in comparison to Lieutenant

Dadian and Dadian himself rated the defendant's overall

performance as "satisfactory" in October 2004.   No prejudice

accrued from this testimony.

///

---

Dadian's  testimony  tended  to  make  the  facts  asserted  by  Ms.
Champion  less  likely  to  be  true.   Other  witnesses  were  called  to
clarify  that  the  defendant  was  never  permitted  to  take  contraband
such  as  child  pornography  to  his  home  for  any  purpose.

[10]The  issue  was  raised  earlier  in  the  trial  and  the  Court  ruled
Exhibit  30  would  not  be  admitted  in  the  government's  case-in-chief.
After  defense  witnesses  testified  to  the  defendant's  diligence
while  working  in  the  Sex  Crimes  Unit,  the  door  was  opened  and  the
Court  permitted  the  government  to  elicit  the  above-described
testimony  from  Lieutenant  Dadian,  along  with  Exhibit  30.

J.  Admission of Fresno County Sheriff' Department Policies
    and Procedures Regarding Collection and Storage of
    Evidence

The defendant claims that the evidence storage policy from

the law enforcement agency that he worked at should not have been

introduced because it was an incorrect statement of "the law."

He claims that the policy was given equal weight as federal

criminal statutes.  A main defense theory was that the defendant

was legally entitled to possess the contraband, because he was a

law enforcement officer.  The defendant also suggested that he

had obtained and possessed the contraband for a legitimate work-

related purpose such as for use in future training sessions, if

he ever returned as a supervisor in the Sex Crimes Unit.

The defendant also presented testimony from his ex-wife that

he was such a dedicated employee that he often brought work home

while employed in the Sex Crimes Unit, and she even saw him

working on a child pornography case one evening.  The defendant

also presented testimony that the equipment available to him

during his tenure in the Sex Crimes unit was inadequate, and this

caused him to have to take evidence home, such as in the Armenta

investigation, to make a copy of a portion of that evidence for

use in the follow up work.  The defendant also presented

testimony from a former Sheriff's Department employee who claimed

that the defendant had been permitted to do work on "proactive"

investigations in the Sex Crimes unit on Defendant's personal

laptop computer.  The defendant presented this testimony to try

to explain why some of the child pornography evidence would have

been found on computers that he used.

Because the defendant asserted that he had legitimate, work-related reasons to explain the child pornography evidence, the government was entitled to rebut this with evidence of the Fresno County Sheriff's Department policies and procedures for handling evidence.  Evidence of these policies and procedures was relevant to show that even law enforcement officers were prohibited from possessing contraband outside of the workplace, and that there were strict rules in place for handling contraband evidence in order to maintain its integrity for use in criminal prosecutions.  The government was entitled to present this evidence to rebut the defendant's purported "public authority" defense.  To have omitted this evidence would have denied the prosecution a fair trial.  This ground is therefore without merit.

K.   <u>Greg Vaughn Testimony</u>

The defendant has suggested, but not fully explained his contention that the Court improperly permitted Greg Vaughn to testify as an expert.  This is simply not true.  The government called Greg Vaughn to testify about computers that he might have supplied to the defendant and how it was extremely unlikely, if not impossible, that any child pornography evidence on the defendant's laptop computer was the result of activity from a previous user of the computer (which might have been supplied by Greg Vaughn).  Greg Vaughn denied any expertise in how computers worked, and he denied any knowledge of computer forensics.  There

is no basis whatsoever for the defendant's claim that Greg provided expert testimony.  He did not.  The Court properly permitted him to give testimony based on his personal knowledge of events.

L.   Knowing Possession

The defendant has alleged that he was not permitted to deny knowing possession of the six thumbnail images of child pornography on the theory that they were only visible with the aid of ENCASE software.  As addressed under the section related to the allegedly improper exclusion of testimony by David Penrod, the Court ruled that the defendant was simply trying to confuse the jury with irrelevant and misleading information about the evidence offered by the government.  As the government conceded that they did not have the actual images that the defendant was charged with receiving and possessing (and attempting to receive and possess), whether or not the version of them contained within a thumbs.db file was viewable was simply not relevant.  The evidence within the thumbs.db file was circumstantial evidence of the defendant's knowing receipt and possession (or at least attempted receipt and possession) of at least six images of child pornography.  There was no dispute, nor was it claimed, that the Thumbs.db evidence was viewable.

M.   The Length of Trial

The defendant has claimed that the Court was frustrated with the length of time the trial was taking and that this unfairly

prejudiced him, because he was precluded from presenting a full and fair defense.  The Court allegedly stated, "I'm going to pull the curtain down on this trial and give the jury a binding estimate."  To the extent that the Court made such a statement, it was made outside of the presence of the jury in an attempt to focus counsel and to provide a reasonable estimate of a timeframe for completion of the case to give the jury.  The Court was not impatient and allowed the defense to continually extend the length of the case, to expand the amount of evidence presented, and to cross-examine witnesses without limitation.  If anything the Court was not sufficiently strict in limiting the presentation of evidence and the examination of witnesses.  This is no basis for granting a new trial.

N.   Jury Instructions "Knowingly and Intentionally"

Attorney Scott Quinlan wanted the Court to give the jury instructions using the words, "knowingly and intentionally," twice.  The Court emphasized these words in the instructions to the jury and is satisfied with the final jury instructions.   The instructions given to the jury were legally correct and provide no basis for granting a new trial.

O.   Attempt Violation

The defendant has argued that the prosecution did not include the requirements for interstate commerce required for the attempt charges.  The Court gave instructions that follow relevant Ninth Circuit authority.  The instructions clearly set

44

forth the elements of each offense, including an interstate commerce element.

    P.   Public Authority Defense

    The defendant has claimed that the Court erred in refusing to give the public authority instructions he initially requested. Those instructions, which were not filed in the Court's docket but were sent to the Court and government counsel via e-mail during trial, provided:

> POLICE OFFICER EXEMPT FROM PROSECUTION FOR ACTS IN COURSE AND SCOPE OF DUTIES
> A local law enforcement officer such as a Fresno County Sheriff Department officer, acting within the course and scope of his duties, may not be criminally prosecuted for his actions.  The government must prove beyond a reasonable doubt that the defendant was not acting within the course and scope of his duties as a law enforcement officer at the time of the act claimed to violate the law charged in each count of the indictment.  If the government fails to prove beyond a reasonable doubt that the defendant acted outside the course and scope of his law enforcement duties at the time of a charged act, you must find the defendant not guilty of that count of the indictment.

> PUBLIC AUTHORITY OR GOVERNMENT AUTHORIZATION DEFENSE
> If a defendant engages in conduct violative of a criminal statute as a law enforcement officer, with the reasonable belief that he is acting as a law enforcement officer performing law enforcement activity, then the defendant may not be convicted of violating the criminal statute, because the requisite criminal intent is lacking.  The government must prove beyond a reasonable doubt that the defendant did not have a reasonable belief that he was acting as a law enforcement officer performing law enforcement activity at the time of the offense charged in the indictment.

*See also* Dkt. # 210.  The government filed a brief in opposition

45

to Defendant's proposed instructions, arguing *inter alia* that:

> [T]he public authority defense "is narrow and applies only where [D]efendant establishes (i) an 'objectively reasonable reliance' upon (ii) the '*actual* authority of a government official to engage him in a covert activity.'" United States v. Kuai Li, 475 F. Supp. 2d 590, 592 (E.D. Va. 2007) (quoting United States v. Fulcher, 250 F.3d 244, 253-54 (4th Cir. 2001)). "[A]s with most affirmative defenses, to avail himself of this defense [D]efendant must adduce some evidence sufficient to warrant an instruction to the jury, although the ultimate burden of proof remains with the government to prove intent beyond a reasonable doubt." Kua Li, 475 F. Supp. 2d at p. 592 n.5. See also United States v. Matta-Ballesteros, 71 F.3d 754, 770 n.12 (9th Cir. 1995)(finding that the defense of public authority unavailable where "a CIA agent could not lawfully authorize the violation of the federal drug laws").
>
> Here, Defendant has failed to identify any particular government official as supposedly providing a basis to assert such a defense and he has failed to adduce evidence that he had objectively reasonably relied upon the actual authority of that unnamed government official. Thus, as in Kuai Li, "the public authority defense is patently inapplicable." Id. at p. 593. It is also clear that Defendant cannot assert that he relied on his own or someone else's *apparent* authority to allow him to receive and possess child pornography. "This argument is unavailing because the public authority defense applies only where [D]efendant relies on the '*actual* authority of a government official to engage him in a covert activity.'" Id. (quoting Fulcher, 250 F.3d at 235) (emphasis in original).

Dkt. #212 at pp. 3-5.  A day-long hearing was held on February 27, 2008, at which counsel argued whether there was a basis in law or in the evidence presented at trial for the applicability of the defendant's proposed jury instructions or Ninth Circuit Model Jury Instruction 6.10, which provides:

> If a defendant engages in conduct violative of a criminal statute at the request of a government enforcement officer, with the reasonable belief that

46

> the defendant is acting as an authorized government
> agent to assist in law enforcement activity, then the
> defendant may not be convicted of violating the
> criminal statute, because the requisite criminal intent
> is lacking. The government must prove beyond a
> reasonable doubt that the defendant did not have a
> reasonable belief that [he] [she] was acting as an
> authorized government agent to assist in law
> enforcement activity at the time of the offense charged
> in the indictment.

The government pointed out at the instruction conference that even if a member of the Fresno County Sheriff's Department had authorized the defendant to receive and/or possess the charged child pornography images (a proposition not supported by the evidence adduced at trial), that authority would not be *actual* because a state actor cannot legally authorize another state actor to violate federal law. See United States v. Mack, 164 F.3d 467, 474 (9th Cir. 1999) (rejecting the defendant's claim that the trial judge erred in refusing to instruct the jury on the defenses of estoppel and reliance on a public authority where the defendant "did not rely on the advice or authority of *federal* officials or agents") (emphasis in original) (citing United States v. Collins, 61 F.3d 1379, 1385 (9th Cir. 1995); United States v. Burrows, 36 F.3d 875, 882 (9th Cir. 1994)).

Ultimately the Court determined that the defendant's notice of his intention to assert a Public Authority defense, filed under Federal Rule of Criminal Procedure 12.3, and the evidence he presented at trial in support of such a defense, were deficient in that Defendant failed to identify a person with

actual authority on whose behalf the defendant claimed to have

acted in receiving and possessing the charged child pornography

images.  Thereafter the defendant proposed the following more

general instruction: "Federal child pornography laws do not apply

to the activities of law enforcement and prosecuting agencies in

the investigation and prosecution of criminal offenses."  The

government argued, and the Court found, that the defendant's

newly proposed instruction did not correctly summarize the law.

In lieu of that instruction, the Court proposed its own:

> Child pornography is contraband.  Under the state law,
> a law enforcement officer may only use, possess, or
> receive child pornography for investigation,
> prosecution, defense and resolution of a criminal case
> in which the child pornography is the subject of a
> criminal charge.  Child pornography may be possessed or
> received by a law enforcement officer for training or
> education purposes only where the law enforcement
> officer who possesses or receives the child pornography
> is expressly authorized to engage in training and
> education activities pursuant to such a duty assignment
> by the law enforcement agency that employs the officer,
> in the course and scope of his law enforcement
> employment, and in accordance with the rules,
> regulations, and policies of the law enforcement agency
> that employs the officer.

After a further hearing on the morning of February 28, 2008, the

Court's new proposed instruction was edited to read as follows

and was given:

> Child pornography is contraband under federal and state
> law.  Under the law, a law enforcement officer may only
> use or have child pornography for investigation,
> prosecution, defense and resolution of a criminal case
> involving child pornography and only in the course and
> scope of his law enforcement employment and within the
> authority granted by the law enforcement agency that
> employs the officer.

48

Dkt. # 221, Instruction 29.

The defendant claims the Court erred in not giving his initial proposed instructions and in giving the instruction immediately above, which he claims could have led the jury to assume "that the rules and regulations of the Fresno County Sheriff's Office are equal in weight and application to federal criminal statutes." Defendant's Motion at pp. 21:11-16; see also id. at p. 24: 13-21. District Courts have "substantial latitude in tailoring jury instructions." Nobari, 2006 WL 2535052 at *22, 2006 U.S. Dist. LEXIS 66079 at *61. "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." Id. (citing Brewer v. City of Napa, 210 F.3d 1093, 1097 (9th Cir. 2000)). Where a defendant complies with Federal Rule of Criminal Procedure 30 by properly objecting to an instruction, the abuse of discretion standard applies on appeal. Nobari,2006 WL 2535052 at *22, 2006 U.S. Dist. LEXIS 66079 at *61 (citing United States v. Garcia, 353 F.3d 788, 791-92 (9th Cir. 2003)). "Where a party fails to object, an allegedly erroneous jury instruction will be reviewed for plain error [and reversal] is appropriate only if the error is so highly prejudicial that it affects a defendant's substantial right to a fair trial. Id. (citing United States v. Jimenez Recio, 371 F.3d 1093, 1099 (9th Cir. 2004); Fed. R. Crim. P. 52(b)). While the defendant preferred his own version(s) of the instruction, he ultimately did not object to the giving of the final version of the Court's

1    instruction.

2        The Court did not abuse its discretion in providing the

3    above instruction to the jury.  The instruction was prompted by

4    the defendant's requests and correctly informed the jury that

5    child pornography is contraband under federal and state law and

6    thus, it may only be legally possessed by law enforcement

7    officers if it is being used or kept for investigation,

8    prosecution, defense and resolution of criminal cases within the

9    course and scope of the law enforcement officer's duties and

10   within the authority granted by the government agency employing

11   the officer.  There was no evidence presented at trial that would

12   have justified reliance upon the instruction to acquit the

13   defendant on any of the charged counts, and the jury's apparent

14   agreement and decision to convict makes any error committed by

15   the Court in giving the instruction harmless.[11]

16   ///

---

18       [11] Defendant's other complaints about the Court's jury
19   instructions are also meritless and do not entitle him to an
     acquittal or a new trial.  He has argued that on "February 28,
20   2008, in the morning, the Defendant requested Instruction Number 26
     regarding the word 'producing', have the word 'knowingly' before
21   the words 'downloaded or saved" (sic).  The defendant claims that
     the Court's instruction lacked a mens rea element.  But the Court
22   gave the correct definition of "Producing," and the instructions
     for each offense referenced the requisite mens rea and made it
23   clear that the necessary acts must have been done knowingly or
     intentionally.  Docket Item 221, Jury Instructions 15-19, 26.
24   Although the defendant claims that the Court's decision to provide
     a separate instruction regarding the attempted commission of each
25   offense was error, he has provided no authority for this assertion.
26   The instructions clearly set forth the elements of each offense,
     including an interstate commerce element.

27

Q.   Post-Trial Virus Theory

After the trial, Defendant claimed he had "discovered a new theory of defense," that a virus was responsible for the child pornography on Defendant's computers.  Any virus theory was well known to Mr. Penrod and in light of the "no knowledge" computer defense asserted by Defendant, it is inconceivable Mr. Penrod would not have known of and considered the potential for such a defense.  It is not "newly discovered evidence."

The Court finds that David Penrod was aware of the theory that a Trojan virus could infiltrate a computer via the BearShare network, whether through Gnutella or not, as evidenced by his prior testimony regarding a similar theory in another case.  In light of the evidence that has already been presented (i.e., the theory that Ms. Ramirez falsely "set-up" the defendant, the theory that someone else was responsible for the images being on the computer, etc.), it is inconceivable that this defense was merely "overlooked."  The Court believes that the defendant purposefully chose to present the "Ramona defense," rather than a virus or unknown intruder defense, because Ms. Ramirez – the defendant could argue – had a motive to "destroy" and be vengeful to the defendant.  The evidence about a virus is not new, in the sense that any computer scientist has known about such a possibility since no later than 2001.

Not only is the possibility of a virus being responsible for the child pornography and related evidence on the defendant's

1  computers not newly discovered evidence, it is highly unlikely

2  that this theory could plausibly explain the evidence in this

3  case.  The government presented expert forensic evidence, from

4  Mr. Rick Kaplan, to rebut the theory that a virus was responsible

5  for the evidence used to convict the defendant.  The defendant

6  had antivirus software operating on his computers.  In addition,

7  the more recent defense theory cannot plausibly account for why

8  child pornography would be downloaded onto numerous computers for

9  which the defendant was the only common user and why that

10 evidence would then be deleted (yet appear in unallocated space

11 in the computer's hard drive).  It is highly unlikely that

12 someone would hack into the defendant's computers, which

13 necessarily would have required remote access through distinct

14 internet protocol addresses at different times, and place child

15 pornography onto the computer only to then delete that same

16 evidence, all without the purported knowledge of Defendant.  The

17 virus theory cannot explain why the defendant had a compact disc

18 (manufactured after he left the sex crimes unit) at his

19 photography studio in 2005, a time at which he had no legitimate

20 reason to have child pornography.  Nor could the virus theory

21 explain why the disc contained only a portion of the evidence

22 from the David Armenta investigation on which the defendant

23 worked in 2000.

                          CONCLUSION

24

25     For these reasons, the motions for judgment of acquittal and

26 ///

27

                              52

///

for a new trial pursuant to Fed. R. Crim. Proc. 29 and 33 are denied on all grounds.


IT IS SO ORDERED.

**Dated:    September 2, 2008**                    **/s/ Oliver W. Wanger**
                                      UNITED STATES DISTRICT JUDGE